AO (Rev. 5/85) Criminal Complaint

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| UNITED STATES OF AMERICA | CRIMINAL COMPLAINT |
|---|---|
| vs. | CASE NUMBER: 8:09-MJ-1334-T-EAJ |
| BEAU DIAMOND | |

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief.  In or about April, 2006, and continuing through in or about January, 2009, in Sarasota County, in the Middle District of Florida, and elsewhere, the defendant did,

commit wire fraud and money laundering

in violation of Title 18, United States Code, Sections 1343, 1956(a)(1)(A)(i) and 1957.  I further state that I am a(n) Special Agent with FBI, and that this Complaint is based on the following facts:

SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof:  ☒ Yes   ☐ No

Signature of Complainant
Lynn Billings

Sworn to before me and subscribed in my presence,

July 20, 2009                                       at           Tampa, Florida

ELIZABETH A. JENKINS
United States Magistrate Judge
Name & Title of Judicial Officer                    Signature of Judicial Officer

## CRIMINAL COMPLAINT

I, Lynn M. Billings, Affiant, being duly sworn, hereby depose and say that:

1. I am a Special Agent of the Federal Bureau of Investigation (FBI). I have been a Special Agent of the FBI since February 4, 1996, and am currently assigned to the Sarasota, Florida Resident Agency. As a Special Agent, I am responsible for investigating violations of federal criminal laws, to include violations involving wire fraud and money laundering. I have received specialized training in this type of fraud, as well as other types of white collar crimes. The purpose of this Affidavit is to establish probable cause in support of an application for complaint. I, therefore, have not included every fact discovered through this investigation.

2. Information obtained in the Affidavit is based, in part, on observations made and an investigation conducted by your Affiant and Special Agent Diane Knott, Internal Revenue Service, Criminal Investigation (IRS-CI). Special Agent Knott has been employed by IRS-CI for 21 years and is currently assigned to the Sarasota, Florida office. Special Agent Knott has received specialized training in white collar crimes and money laundering.

3. Since January 2009, your Affiant and Special Agent Knott have jointly conducted an investigation of Beau Diamond, date of birth 04/28/1978, who was doing business as Diamond Ventures LLC. Diamond Ventures is an active Florida Corporation, incorporated on March 30, 2006. Diamond Ventures was formed for the purposes of participating in currency trading.

4. Currency trading involves the exchange of one currency for another. For example, trading United States dollars for Euros. The foreign exchange (forex) market is the place where currencies are traded. The forex market permits trading to take place 24 hours a day, 7 days a week, which allows traders to react instantly to major developments currently affecting the market.

## WITNESS INTERVIEWS

5. From January to July 2009, your Affiant and Special Agent Knott interviewed investors who had placed monies with Beau Diamond for the purpose of participating in forex trading. The interviews revealed the following information.

6. In or about April 2006, Diamond began soliciting friends and family members to invest monies into Diamond Ventures for the purpose of trading the funds in the forex market. Diamond told these individuals that he had participated in forex trading for approximately eight years. Diamond advised many investors that he originally lost funds when he began trading the forex market, but he had learned from his mistakes and had developed a highly successful trading strategy.

7. Diamond promised many investors that the investment was risk free. Diamond explained to investors that he would only be trading with a small percentage of their principal, approximately 15%. Diamond further added that he had stop gaps in place that would shut down trading if more than 15% of the investors' principal was lost. If such losses occurred, Diamond would guarantee those losses with profits Diamond had realized on previous trades.

8. Diamond guaranteed investors a monthly profit between 2.75% and 5% per month. Diamond claimed that through his trading, he averaged monthly profits ranging from 5% -15%. Diamond represented that his fee would only come from any amount over the agreed upon percentage for each investor. For example, if an investor was guaranteed a monthly profit return of 4% and Diamond made a 10% profit return, Diamond would keep 6% as his fee.

9. Investors could chose between two funds within Diamond Ventures. The first program was known generally as the "rollover program". In the rollover program, the monthly profits stayed in the account and were added to the principal amount each month. In order to encourage investors to enter the rollover program, Diamond generally offered a higher percentage profit return for rollover investments. The second program was generally known as the "withdrawal program". In the withdrawal program, the investor received a monthly profit check, and a statement asserting that their principal investment amount stayed the same from month to month.

10. The investors signed a Participation Agreement with Diamond Ventures prior to making their initial deposit. The Participation Agreements specifically stated the percentage rate of profit return for each individual investor. If additional deposits were made, the investor signed an Additional Deposit Form. These forms were used to denote the amount of the investment contribution, the percentage rate of profit return, and which program option the investor chose.

11. Once the funds were placed into the program, the investor began to receive electronic copies of account statements. From approximately June 2006 to December 2008, investors were e-mailed electronic account statements indicating their investments were accruing profits as promised. Investors who had chosen the withdrawal program also received monthly checks in the mail, corresponding to their monthly profit amounts.

12. A few months after the program began, Diamond encouraged investors and friends to refer additional investors to Diamond Ventures. To provide an incentive to refer others, Diamond offered commissions on the principal amount received from referred investors. This commission ranged from 1% of the principal amount each month for as long as the principal remained in the program, to a flat one time fee of $500 for each referral.

13. From May 2006 to December 2008, investors communicated with Diamond primarily through telephone conversations and e-mail. Throughout this time period, Diamond indicated to investors that the trading program was doing well and realizing the anticipated profits. In July 2008, Diamond sent out an e-mail to investors stating he was trying to reach "institutional" status for trading purposes, so that Diamond Ventures would obtain brokerage fee discounts. Diamond represented to investors that the brokerage houses required a minimum account balance in order to obtain an "institutional" status. In order to induce current investors to invest more monies with Diamond Ventures to obtain the "institutional" status, Diamond offered a 10% bonus to investors. The bonus was to be added to the account principal and would be realized six months after the funds had been placed with Diamond Ventures. For example, if an investor invested an additional $100,000 with Diamond Ventures, then the investor was guaranteed, in addition to the normal profit return, a $10,000 principal bonus.

14. In October 2008, Diamond sent out a newsletter to investors advising that he had been contacted by some of the investors who were worried about the economic downturn. Diamond assured the investors that the program was performing satisfactorily. The newsletter continued by stating, "Diamond Ventures is supremely safe and secure, and will remain so, because its returns are predicated on the never-ending exchange of currency."

15. In December 2008, investors received the electronic account statements showing the promised returns, but many investors in the withdrawal program did not receive their monthly interest check. Investors began to contact Diamond Ventures about the profit checks. On December 10, 2008, Diamond sent out an e-mail to investors stating that the delay in receipt of the checks was due to a banking error. On December 12, 2008, Diamond sent out an e-mail to investors stating that he had changed banks and the profit checks would be sent out three days later. On December 18, 2008, Diamond sent out an e-mail to investors indicating that the checks had been issued, but that the investors might experience a delay in delivery due to the Christmas mail volume. Near the end of December 2008, Diamond went on vacation to Costa Rica using investor funds to pay for the vacation.

16. On January 9, 2009, Diamond e-mailed the investors, and announced that all of their funds had been lost due to the economic crisis. Diamond's e-mail further stated that he had come up with another money-making endeavor to recover all of the investors' lost funds. Additionally, Diamond informed the investors that a forensic accounting of the Diamond Ventures' accounts would be performed and provided to each investor to prove that the funds had been lost through trading. Diamond assured investors that the monies had not been "hidden, stolen or otherwise withheld" from the investors. To date, Diamond has not provided the investors with any type of accounting for the Diamond Ventures' accounts.

## FINANCIAL ANALYSIS

17. Your Affiant and Special Agent Knott have traced the flow of funds related to the Diamond Ventures' bank accounts, and was opened by Diamond on April 26, 2006, in the name of Diamond Ventures LLC. The account number is known to your Affiant, but for purposes of this Affidavit will be referred to as #XXXXXXXX7477. Investors deposited monies into Diamond Ventures' bank account through a variety of means, to include: (1) transferring funds via a wire, (2) sending electronic funds transfers through their own Bank of America account, or (3) writing a check to Diamond Ventures that would then be deposited into the Diamond Ventures' Bank of America account. Diamond had the sole signature authority on this account. Financial analysis revealed that over 99% of the funds that were deposited into the Diamond Ventures' Bank of America account were investors' principal being placed with Diamond Ventures for the purpose of participating in forex trading. Diamond also had a personal account at Bank of America. This account number is known to your Affiant, but for purposes of this Affidavit will be referred to as account #XXXXXXXX4835. The account was opened on April 2, 2004, and Diamond had sole signature authority on this account. On December 11, 2008, Diamond opened a Diamond Ventures bank account at J.P. Morgan Chase. This account number is known to your Affiant, but for purposes of this Affidavit will be referred to as account #XXXXX3770. Diamond had sole signature authority on this account.

18. From April 2006, through August 2006, Diamond took in over $800,000 in investor principal. The only trading which took place during this time period was $240,000 sent to an R.J. O'Brien trading account on June 30, 2006. An examination of the results of this trading revealed that by the beginning of September 2006, Diamond had lost over $130,000 of the trading funds. During the same time period, Diamond took $24,000 of the investors' principal in the Diamond Ventures' bank account for his own personal expenses. From April to August 2006, Diamond had received over $835,000 in investor principal, and yet as of August 30, 2006, the balance of the combined Diamond Ventures' bank account and the Diamond Ventures' trading accounts totaled less than $612,000. In other words, by August 30, 2006, Diamond had either lost through trading, or used for personal or other unauthorized expenditures a total of approximately $223,000.

19. Diamond did not disclose the losses in trading to the investors. Instead, Diamond indicated to the investors, via account statements and correspondence, that the program was performing as promised and the guaranteed returns were being realized. For individuals in the withdrawal program, Diamond began paying their monthly profit payments from other investors' principal. In order to have enough investor principal to make these payments, Diamond continued to solicit additional investors into the program.

20. From September 2006, through April 2007, Diamond received additional investor principal of more than $9,200,000. Diamond transferred $3,500,000 of those

funds into trading accounts at Gain Capital and Global Forex Trading. Diamond's trading efforts during this period resulted in losses of over $2,800,000. In addition, Diamond used a portion of the investors' principal to purchase a waterfront condominium in Sarasota, Florida. Specifically, on March 30, 2007, Diamond transferred $500,000 from the Diamond Ventures Bank of America account to his personal account at Bank of America. On May 1, 2007, Diamond purchased the condominium and paid for the equity requirement with a cashier's check for $127,422.74, which was purchased with investors' principal that was transferred into Diamond's personal account. Without the $500,000 transfer from the Diamond Ventures account, Diamond did not have the funds in his personal account to make the equity payment on the condominium. Also, Diamond used approximately $138,000 of investors' principal to make monthly loan payments on the condominium, while he resided at the condominium. Through April 2007, Diamond received over $10,000,000 in investor principal, and yet the balance of the combined Diamond Ventures bank account and trading accounts totaled less than $4,100,000. In other words, by April 30, 2007, Diamond had either lost through trading, or used for personal or other unauthorized expenditures a total of approximately $5,900,000.

21. Diamond again did not disclose the losses in trading to the investors. Instead, Diamond indicated to the investors, via account statements and correspondence, that the program was performing as promised and the guaranteed returns were being realized. For individuals in the withdrawal program, Diamond continued to pay their monthly profit payments from other investors' principal.

22. From May 2007, through January 2008, Diamond received additional investor principal of over $11,800,000. Diamond transferred $5,800,000 into trading accounts at Gain Capital and Global Forex Trading. Diamond's trading efforts during this period resulted in losses over $6,500,000. Despite the dismal trading performance, Diamond purchased a 2006 Lamborghini Gallardo for $204,000. To make the purchase, Diamond transferred $200,000 of investors' principal on February 6, 2008, from the Diamond Ventures bank account to his personal account at Bank of America. Diamond immediately re-sold the car to Putnam Leasing and entered into a lease agreement with Putnam to lease the automobile back to him. Diamond was required to provide a $54,000 down payment on the lease of the vehicle. Putnam Leasing paid Diamond the outstanding balance on the lease agreement by writing a $140,524.77 check to Diamond, which Diamond deposited into his personal bank account on March 20, 2008, and later used for personal expenses. The monthly lease payments of $2,297 were paid from investors' principal. Through January 2008, Diamond had received over $21,000,000 in investor principal, yet the combined Diamond Ventures bank account and trading accounts totaled less than $4,100,000. In other words, by January 30, 2008, Diamond had either lost through trading, or used for personal or other unauthorized expenditures a total of approximately $16,900,000.

23. On March 20, 2008, Diamond exchanged e-mails with an investor. This investor is known to your Affiant, but for purposes of this Affidavit will be referred to as

Investor R.S. In approximately March 2008, Diamond advised investors he was lowering the profit percentages that would be paid out monthly. Investor R.S. had inferred in the March 20th e-mail that Diamond was taking money from the investors' principal based on the percentage reduction. Diamond sent back an e-mail in large, bold print stating, "NO [R.S.], I'm NOT taking ANY money from clients' principal . . . . Do you understand the definition of principal? It's the original deposit. It's however much money you deposit in the club. Money that is being paid out to you is PROFIT. BIG difference."

24. From February 2008, through June 2008, Diamond received additional investor principal of over $9,700,000. Diamond transferred $5,100,000 to trading accounts at Interbank FX and Global Forex Trading. Diamond's trading effort during this period resulted in losses over $3,900,000. Through June 2008, Diamond had received over $31,000,000 in investor principal, and yet the combined Diamond Ventures bank account and trading account totaled less than $790,000. In other words, by June 30, 2008, Diamond had either lost through trading, or used for personal or other unauthorized expenditures a total of approximately $30,210,000.

25. In July 2008, based on poor trading results, unauthorized expenditures, and the ever escalating monthly profit payment demands, the Diamond Ventures account balance became deficient of funds to pay the monthly investor profit payments. During July 2008, ten of the investors' monthly profit payment checks drawn on the Diamond Ventures bank account were returned for insufficient funds. In order to perpetuate the scheme and to induce investors into providing more principal, approximately seven days after the checks were returned for insufficient funds, Diamond sent out an e-mail to all investors offering a 10% bonus program. Diamond claimed that 10% of any principal amount put in by investors would be credited to the investor's account after it had been in the account for a six month period of time. Diamond indicated that this program would only be offered for a limited time, but he did not specify the time period.

26. In response to the e-mail, Diamond Ventures received over $2,400,000 in additional investor principal from July 22, 2008, to September 30, 2008. From July 22, 2008, to September 30, 2008, Diamond did not forward any funds to a trading program, and instead removed $100,000 from the trading accounts and redeposited the funds into the Diamond Ventures' Bank of America account. Additionally, Diamond used investors' principal for a personal vacation. Specifically, on or about August 31, 2008, Diamond took a 12 day trip to Las Vegas, Nevada. While in Las Vegas, Diamond used over $110,000 of investors' principal to pay for gambling activities and travel expenses. During the same time period, Diamond also transferred $20,000 from the Diamond Ventures Bank of America account to his own personal account at Bank of America. During this trip Diamond incurred gambling losses in excess of $39,000.

27. While Diamond Ventures LLC was about to crash, records indicate Diamond was in Las Vegas, Nevada from October 21, 2008, to November 19, 2008. During this time period, Diamond used over $319,000 of investors' principal to pay the gambling

activities and travel expenses for he and his travel companion(s). Diamond incurred gambling losses in excess of $125,000, and made an average bet of approximately of $3,180.

28. From October 2008, through December 2008, Diamond received additional investor principal over $3,300,000. Diamond transferred $800,000 into a trading account at Gain Capital. Diamond's trading effort during this time period resulted in losses over $115,000. Through December 2008, Diamond received over $37,600,000 of investor principal yet the combined Diamond Ventures bank accounts and trading accounts totaled less than $145,000. In other words, by December 30, 2008, Diamond had either lost through trading, or used for personal or other unauthorized expenditures a total of approximately $37,455,000.

29. On January 9, 2009, Diamond sent out an e-mail to the investors advising that all of the investors' monies had been lost. In telephone calls with several of the investors, Diamond claimed that several months earlier, half of the funds had been lost due to a trading error by one of Diamond's trading partners. Diamond added that the remaining amount had been lost based on aggressive trades made in an effort to make up for the funds lost in error.

30. On January 13, 2009, during a conference call with a group of Diamond Ventures investors, Diamond made admissions regarding the improper use of investor funds. Diamond told the group that despite a significant loss of the investors' principal, he continued to send out monthly statements indicating the program was sound and performing as promised. Diamond added that he did not divulge the true status of funds because he was concerned about being able to meet future withdrawal requests. Diamond admitted that as a result of the losses he began making the investors' monthly profit payments with other investors' principal.

31. Diamond was aware that his unauthorized use of the investors' funds was criminal. In order to dissuade people from going to law enforcement or participating in a civil lawsuit, Diamond sent out an e-mail dated January 22, 2009, to the Diamond Ventures investors. In the e-mail, Diamond wrote "Someday I am going to be standing in front of a judge because of what has transpired. . . . The only result of this lawsuit will very likely be a federal investigation, which right now has NOT yet been initiated. If that starts, I am done. There is nothing I can do to get funds back to everyone. No one will ever see a penny, and I most likely will be behind bars."

32. The analysis of the Diamond Ventures accounts revealed that from July 2006, to December 2008, Diamond never made enough profit on forex trading to pay the cumulative profits he guaranteed his investors. From the beginning, Diamond operated the program as a "Ponzi" scheme, that is, Diamond used subsequent investors' principal to make the alleged profit payments to other investors. In total, Diamond received over $37,600,000 in principal from approximately 200 investors. The financial review indicated that from those funds $15,400,000 was lost in trading activity, $15,600,000 was

7

returned to investors in the form of profit payments, commissions, and/or returned principal, and $6,600,000 was used by Diamond for unauthorized expenditures, including personal expenses in the amount of $2,200,000 for vacations, gambling, a waterfront condominium, a Lamborghini Gallardo, and the rental of a high end residence in Newport Beach, California (at a rate of $16,000 per month).

## EXAMPLES OF VICTIM INVESTORS

33. The foregoing provides a general pattern of conduct. Specific examples include the following. An investor known to your Affiant, but for purposes of this Affidavit will be referred to as Investor B.R., invested $250,000 with Diamond Ventures on August 15, 2008. Investor B.R. made the investment by wire transferring the monies from the West America Bank in Santa Rosa, California to the Diamond Ventures' Bank of America account in Florida. As mentioned previously, despite having checks returned for insufficient funds in July, 2008, Diamond induced Investor B.R. to make the August 15th investment by advising him/her that the Diamond Ventures program was sound and making profits of at least 3% per month.

34. An investor known to your Affiant, but for purposes of this Affidavit will be referred to as Investor D.C., received a payment from Diamond Ventures on August 8, 2008, which Investor D.C. believed was profit generated on his/her investment. Investor D.C. received check #6684 in the amount of $48,750 from the Diamond Ventures' Bank of America account. Investor D.C., believing the program was generating the promised profits, subsequently invested an additional $1,000,000 into the program on October 9, 2008.

35. Based on the foregoing, the undersigned respectfully submits that there is probable cause to believe that Beau Diamond committed wire fraud in violation of Title 18 U.S.C. Section 1343. In addition, based on false profit payments sent to the investors from the wire fraud proceeds, the undersigned respectfully submits that there is probable cause to believe that Beau Diamond also committed money laundering in violation of Title 18 U.S.C. Section 1956 (a)(1)(A)(I) and 1957.

Further, your Affiant, sayeth naught.

Lynn M. Billings
Special Agent
Federal Bureau of Investigation

Sworn before me and subscribed in my presence
this 20th day of July, 2009.

ELIZABETH A. JENKINS
United States Magistrate Judge